ERNEST M. LINDSAY, Administrator, v. SONORA GOLD MINING & MILLING COMPANY, et al., Appellants.

**Division One, June 29, 1912.**

1. **FRAUD: When Actionable: Or When Vitiates Contract: Necessary Proof.** In order to prove actionable fraud, or such fraud as will vitiate a contract, the evidence must show that the representations made regarding the subject-matter of the contract were false in fact, and that the party who made them knew they were false, or that the party who uttered them had no reasonable grounds for believing them to be true at the time they were uttered; and that the party to the contract claiming to be defrauded believed said utterances or statements to be true and acted upon them, and in consequence of said false statements and in reliance thereon he was damaged or injured thereby.

2. ————: **Representations to Deceased: Inferred from Circumstances: Made to Others: Purchase of Mining Stock.** That the promoters of a mining venture represented to deceased, to whom they sold 50,000 shares of the stock at forty cents a share, that their company owned a mine in Sonora, Mexico, and that they wished to use the money for which the stock was sold to him to develop the mine and construct a mill, may be inferred from the facts that they got up an excursion to the mines, obtained a special sleeping car, invited prospective investors to accompany them as their guests, at their expense; that deceased accompanied them, and apparently was taken for no other purpose except to induce him to become an investor; that such representations were made to all the other testifying guests; that he mingled with and frequently talked with them and the promoters: that those representations were generally and freely

Lindsay v. Mining Co.

made by the promoters on the car, both going and coming, and at the mines; that he was a man of fine business sense and experience, and thereafter bought the stock, and that he was the first of the guests invited into and to enter the drawing room of the car into which the promoters, on the return trip, separately invited their guests for the purpose of soliciting them to buy the stock, and to whom the same representations were made—although there is no direct and positive testimony that those representations were made to deceased. It may also be inferred from the testimony of a witness that said promoters authorized him, in the presence of deceased, to state to ·capitalists in another city that the company owned the mines and to sell them stock in the company on that basis, and promised him an interest in the mine if he would do so. It may also be inferred from the testimony of witnesses that said promoters, with a view of selling them stock, about the same time represented to them that the company owned the mines, and that they bought in pursuance of said representations. All of said testimony was competent, and upon a demurrer makes out a prima facie case of fraud; and as it is otherwise shown that the company did not at any time own the mines, if deceased bought the stock relying upon said representations, his administrator is entitled to recover the money he paid for the worthless stock.

3. ———: ———: ———: Investment in Reliance Thereon. And there being no evidence tending to show that deceased purchased the worthless stock under any other or different circumstances than in pursuance to those false representations, his administrator has made out a prima facie case entitling him to recover the money obtained from deceased ·in pursuance thereof. It is not reasonable that an experienced and prudent business man would have invested $20,000 in a mine, to be used for its development and equipment, if he had not believed the company and its promoters owned the mine.

Appeal from Buchanan Circuit Court. *Hon. L. J. Eastin,* Judge.

REVERSED AND REMANDED.

*Kendall B. Randolph* and *James W. Boyd* for appellant.

(1) There is a complete failure of consideration as to the instrument pleaded in the answer. Failure of consideration and partial failure of consideration

are always available as a defense. R. S. 1909, sec. 1974; Tinker v. Kier, 195 Mo. 183; Barr v. Baker, 9 Mo. 854; Tucker v. Bartle, 85 Mo. 114; Bank v. Crandall, 87 Mo. 208; Hess v. Draffen, 99 Mo. App. 580; Brolaski v. Carr, 127 Mo. App. 279; Kerwin v. Friedman, 127 Mo. App. 519; Beland v. Brewing Co., 157 Mo. 593; Brown v. Weldon, 27 Mo. App. 251, 99 Mo. 564; Comings v. Leedy, 114 Mo. 454; Smith v. Hutchison, 61 Mo. 83; Tube Works Co. v. Machine Co., 201 Mo. 30. (2) The excluded depositions were properly admissible in evidence as tending to show a fraudulent purpose on the part of the individual defendants to induce the belief in the minds of investors that they owned the mines in Old Mexico, and as showing their course of dealing with Ernest Lindsay. Smalley v. Hale, 37 Mo. 102; Lockwood v. Doane, 107 Ill. 235; Porter v. Stone, 62 Ia. 442; Bank v. Phillips, 22 Mo. 85; Holmes v. Harrington, 20 Mo. App. 661; Cottrell v. Krum. 100 Mo. 397; Wannell v. Kem, 57 Mo. 478; Bank v. Hunt, 76 Mo. 439; Caldwell v. Henry, 76 Mo. 254; Crump v. Wright, 97 Mo. 13. (3) Fraudulent statements made to others than the deceased Lindsay were admissible in evidence as tending to show a general scheme on the part of the promoters to sell stock on the representation that they owned the mines in Mexico. Rowley v. Bigelow, 12 Pick. (Mass.) 311; Barber v. Martin, 93 N. W. (Neb.) 722; Lockwood v. Doane, 107 Ill. 235; Porter v. Stone, 62 Ia. 422; Smalley v. Hale, 37 Mo. 102; 6 Ency. of Ev., pp. 25, 26, 33 and 36. (4) There is a broad distinction between the admissibility of evidence and the weight of evidence, and there is also a broad distinction between indulging a presumption for the purpose of arriving at a conclusion and in opposing a presumption against a proven fact. State v. Jones, 64 Ia. 349; State v. Pike, 49 N. H. 444; Graves v. Caldwell, 90 Ill. 612; Railroad v. Chambless, 54 Ark. 214; Shirts v. Overjohn, 60 Mo. 308. (5) It was error in the lower

court to hold that a person held an option on real estate, for which only a small percentage of the value of the real estate had been paid, was not guilty of a fraudulent representation when he asserted that he owned the title. Hess v. Draffen, 99 Mo. App. 580; Tinker v. Kier, 195 Mo. 183. (6) It was not necessary to show that false representations were actually made directly to Lindsay himself, he being now dead. Any false representation held out and made to the world at large as being a public statement of the condition of the corporation and intended by the promoters to be relied on by the purchasers of stock is competent evidence when coupled with the fact admitted in this record, that Lindsay purchased stock, and the further fact that he was in frequent contact with the promoters and others to whom those representations were made. Bank v. Phillips, 22 Mo. 35; Holmes v. Harrington, 20 Mo. App. 661; Barr v. Baker, 9 Mo. 54; Smalley v. Hale, 37 Mo. 104; Bank v. Crandall, 87 Mo. 212; Cottrell v. Krum, 100 Mo. 397; Wannell v. Kem, 57 Mo. 478; Bank v. Hunt, 76 Mo. 439; Caldwell v. Henry, 76 Mo. 454; Crum v. Wright, 97 Mo. 13. (7) The statements of the deceased Lindsay offered in evidence should have been admitted. The declarations of the party charging the fraud accompanying the transaction or so nearly connected therewith in time as to free them from suspicion of device are relevant and admissible to explain the influences that moved him to enter into the transaction. McLean v. Clark, 47 Ga. 24; Cook v. Carr, 20 Md. 403; 6 Ency. of Ev. 26; Smalley v. Hale, 37 Mo. 102. (8) The prospectus introduced in evidence, coupled with the testimony that the deceased Lindsay had one of them in his possession upon his return from the trip to Mexico, and at the time he signed the writing set up by the defendants in their answer, was sufficient to take this case to the jury. Bispham's Equity (2 Ed.), p. 264, par. 208; Railroad

v. Muggeridge, 1 Dr. & Sm. 363; Railroad v. Kisch, L. R. 2 H. L. Cas. 113; 3 De G. J. & S. 125; Hallows v. Fernie, L. R. 3 Ch. 475; Smith's Case, L. R. 2 Ch. 609; Swift v. Winterbotham, L. R. 8 A. B. 244; Paddock v. Fletcher, 42 Vt. 389; McClellan v. Scott, 24 Wis. 81; Bagshaw v. Seymours, 4 C. B. (N. S.) 873; Clarke v. Dickson, 6 C. B. (N. S.) 453; Peek v. Gurney, L. R. 6 H. L. Cas. 377; Railroad v. Schuyler, 34 N. Y. 30; Phelps v. Wait, 30 N. Y. 78; Suydam v. Moore, 8 Barb. 358; Bruff v. Mali, 36 N. Y. 200.

*William E. Stringfellow* for respondents.

(1) Appellant attempts to avoid the payment of his note by alleging failure of consideration and fraudulent representations. On this point and most of the points raised by him, he states law with which respondent has no quarrel. Most of the abstract propositions of law contended for by appellant are sound. However, they do not affect the issues in this case. Appellant's points 1 to 8 all relate to fraud and failure of consideration, and may be considered together. Unless there was fraud there was no failure of consideration, as Lindsay received the certificate of stock which he bought. It was a good consideration unless there were fraudulent representations as to the ownership of the property. Smalley v. Hale, 37 Mo. 102; Gore v. Mason, 18 Me. 84; 9 Cyc. 371; Note, 5 L. R. A. 856. The question is simply one of alleged fraudulent representations. While plaintiff makes general allegations of fraud, his defense narrows down to one specific allegation: That defendants claimed to have "owned" the property. The sole question left in the case and the sole question contended for by him in his brief is that defendants committed a fraud when they stated that they owned the Union Minera properties. The alleged prospectus and the statements said to have been made to visitors

on the first trip, that the company owned the Bastilla mine, have no place in this case unless that of confusing the issue. The alleged prospectus and the alleged newspaper clipping, both said to have been published almost a'year before Lindsay made his investment, were rightly considered by the trial court as too remote to have any possible influence on Lindsay, who purchased at a time when the company's plans and properties had entirely changed and when they had purchased a much larger group of properties including a prior and superior title to the Bastilla itself. Plaintiff himself places little reliance on the reference to the Bastilla, and the complaint in his brief relates almost exclusively to the exclusion of the depositions of witnesses to whom the directors of the Sonora Co. pointed out the Union Minera properties as their property. We wish to keep constantly in mind the fact that the question of there being any fraud in any representations made is not in the case, because of the fact that plaintiff entirely failed to offer any competent evidence to show that any statements whatever which defendants might have made were not true. The whole record shows that the representations made were not fraudulent. Assuming for the purpose of the argument that some statement or representation made by defendants be considered inaccurate or untrue, nevertheless that fact alone is not sufficient to sustain the charge of fraud. To constitute fraud certain essential elements must always be proved. One of them is that the party who claims to be defrauded must have acted in reliance upon the alleged fraudulent statements. First of all therefore it must be proved that he knew of such statements. 20 Cyc. 39; Priest v. White, 89 Mo. 609; Anderson v. McPike, 86 Mo. 293; Dunn v. White, 63 Mo. 181; Felix v. Shirey, 60 Mo. App. 621; McNeely v. Bartlett, 123 Mo. App. 58; Holmes v. Harrington, 20 Mo. App. 661; Tinker v. Kier, 195 Mo. 183; Bigelow on Fraud, 87;

2 Addison on Torts (Wood's Ed.), 412. "And all of them must be found to exist. The absence of any one of them is fatal to a recovery." 20 Cyc. 12, 13; Brackett v. Griswald, 112 N. Y. 454; Tinker v. Kier, 195 Mo. 199; Peers v. Davis, 29 Mo. 184, syl. 2. To support an action of deceit the existence of a fraudulent intent must in some way be manifest. 20 Cyc. 35; Dunn v. White, 63 Mo. 181; Summers v. Ins. Co., 90 Mo. App. 691; Tootle v. Lysaght, 65 Mo. App. 139; Brooking v. Shinn, 25 Mo. App. 277; Lovelace v. Suter, 93 Mo. App. 429; Snider v. Stemmons, 151 Mo. App. 156. It must appear that deceit was practiced and for the purpose of putting the vendor off his guard, or that special confidence was reposed in the representations of the vendor, and that the contract was entered into on the strength of the statements; and the proof of the fraudulent representations must be clear. Dunn v. White, 63 Mo. 181; Redpath v. Lawrence, 48 Mo. App. 427, syl. 3; Kilpatrick v. Wiley, 197 Mo. 159; Hume v. Brelsford, 51 Mo. App. 651; 20 Cyc. 108. There must have been a specific representation brought to plaintiff's knowledge. 20 Cyc. 14; Hume v. Brelsford, 51 Mo. App. 651. (2) Appellant makes the statement that testimony of Donovan that subsequent to Lindsay's contract he was present at a conference at which defendants said they owned the Union Minera properties was excluded. This is another erroneous statement. This testimony was not excluded and all oral testimony of this kind was admitted by the court throughout the trial. The only evidence in connection with Donovan that was excluded was an offer by attorneys to prove that Lindsay made a self-serving statement to Donovan sometime subsequent to the purchase of his stock, not even relating to anything that occurred before said purchase. (3) The weakness of appellant's point 3 which is the weakness of his whole brief, is in overlooking the fact that before evidence of representa-

tions made to others can be competent to show fraud, it must first be shown that a similar fraudulent representation was made to Lindsay himself. There was an absolute failure to trace any such statement to Lindsay, either made to him personally or through an agent. Porter v. Stone, 62 Ia. 442. (4) Under point 4 appellant says there is a distinction between the admissibility of evidence and the weight of evidence. As stated, this is one of the several abstract propositions of law laid down by appellant which are undoubtedly sound. All of this is good law, but it has nothing to do with this case. There is in this case a presumption of innocence, a presumption of good faith on the part of the defendants, but the case did not turn on the question of presumption overcoming proof. There was simply an entire failure of proof.

WOODSON, J.—This action was instituted in the circuit court of Buchanan county by the plaintiff against the defendants on two promissory notes, executed by the latter to the former, for the sum of $6250 each. The petition was in conventional form, and contained two counts, one on each note.

The separate answers of the defendants were substantially the same; and I will copy that of the Sonora Gold Mining & Milling Company and others, which will sufficiently outline the defense interposed to the suit by all the defendants. Said answer is in words and figures as follows:

"Now comes Sonora Gold Mining and Milling Company, James M. Johnson and Rice McDonald, defendants in the above entitled cause, and for their separate answer to the petition in said cause, admit that plaintiff is the administrator of the estate of Ernest Lindsay, deceased, and was at the time of the filing of said petition; that the defendant Sonora Gold Mining & Milling Company is and was at all times herein mentioned a corporation as alleged in the pe-

tition; and also admits the execution by these answering defendants of the notes sued on and described in said petition, and both counts thereof and for answer to said petition in behalf of these defendants, and for answer to both counts thereof, these defendants state that both of said notes have been fully paid and satisfied; that they and each of them were settled, discharged and satisfied on or about February 22, 1900, in and by the sale, issue and conveyance of certain shares of the capital stock of this defendant corporation, and the subscription for and purchase by said Ernest Lindsay, deceased, thereof, certificate for which was at said time delivered to him, and by the giving by said Ernest Lindsay as evidencing said transaction of his written obligation hereinafter pleaded as a counterclaim. Wherefore, these answering defendants ask to be discharged with their costs.

"For further answer and for a counterclaim these defendants state that on or about February 22, 1899, said Ernest Lindsay, deceased, made, executed and delivered to defendant Sonora Gold Mining and Milling Company his written obligation dated at St. Joseph, Missouri, February 22, 1900, whereby he promised in consideration of fifty thousand shares of the capital stock of the Sonora Gold Mining & Milling Company, the defendant corporation, to pay to said defendant company on demand twenty thousand dollars without interest; and whereby he further agreed that the notes of Rice McDonald and C. N. Robinson and others for $12,500 with interest to said February 22, should be accepted as part payment, and that the interest on said notes should cease from said date. That the notes of Rice McDonald and C. N. Robinson and others referred to in said writing and agreed therein to be accepted as part payment, are the same notes sued on in the two counts of plaintiff's petition herein. That said fifty thousand shares of stock and the certificates evidencing the same were delivered

to said Ernest Lindsay, deceased, at said time, and were received and accepted by him, and were thereafter retained by him to the time of his death; whereby he became, and at all times was, a stockholder of defendant corporation and acted as such. That a copy of said written obligation duly verified by affidavit is herewith filed. That no part of the balance of said $20,000 after crediting the $12,500 with interest has been paid, but the whole thereof is due, and although demanded remains unpaid.

"Wherefore, these answering defendants ask that defendants Sonora Gold Mining & Milling Company have judgment against plaintiff for the balance of said $20,000 after crediting thereon the notes set up in the petition, with interest thereon from January 29, to February 22, 1900, and for costs."

To this answer the plaintiffs filed the following amended reply, viz.:

"Comes now the plaintiff and for reply to the answer of the defendants, Sonora Gold Mining & Milling Co., James M. Johnson, Rice McDonald and C. N. Robinson, denies each and every allegation therein contained except such as are hereinafter specifically admitted.

"Plaintiff admits that Ernest Lindsay, deceased, in his lifetime signed a certain instrument in words and figures as follows:

"February 22, 1900.

"In consideration of 50,000 shares of stock in the Sonora Gold Mining & Milling Company, the receipt of which is acknowledged, I promise to pay said company on demand, twenty thousand dollars, without interest.

"The notes of Rice McDonald and C. N. Robinson and others for $12,500 with interest to this date shall be accepted as part payment. Interest on said notes to cease from this date.

"ERNEST LINDSAY.

"Which said instrument is mentioned and pleaded in the answer of the said defendants. Plaintiff says that said instrument was entered into, made and executed at St. Joseph, in the State of Missouri.

"Plaintiff further says that in the year 1899, Cary H. Brown, then a resident of Kansas City, Missouri, Charles A. Meeker, a resident of Indiana, and Charles N. Robinson, Rice McDonald and James M. Johnson, together with Louis W. Hax and Benjamin F. Johnson, all residents of St. Joseph, Missouri, associated themselves together as promoters for the purpose of engaging in the promotion of mining schemes in the State of Sonora, Republic of Mexico, and for the purpose of selling stock to promote their schemes as promoters, incorporated the defendant company, and entered into and executed articles of incorporation in the State of Colorado under the name of Sonora Gold Mining & Milling Company with an authorized capital of two million dollars, which capital stock was never paid in, and the said corporation at no time had any assets except such as were derived from the sale of stock in the imaginary enterprises of the said promoters. That although the said promoters, with the exception of Charles A. Meeker, were residents of the State of Missouri, they incorporated under the laws of the State of Colorado for the purpose of evading the laws of the State of Missouri, governing the organizing of corporations. That said corporation was organized for pecuniary profit. That the headquarters of said corporation were maintained at St. Joseph, Missouri. That the public office and place of business of the defendant corporation was maintained in the State of Missouri for the transaction of business at St. Joseph, Missouri, during all said time, and the said Louis W. Hax was the president, and said C. N. Robinson, the secretary of said corporation, and said corporation transacted its business at St. Joseph, Buchanan county, Missouri. That said corporation

has never filed a certified copy of its charter or articles of incorporation with the Secretary of State of the State of Missouri, duly certified and authenticated, and never received a certificate from the Secretary of State of the State of Missouri authorizing it to do business in this State, and has never filed with the Secretary of State of the State of Missouri a statement duly sworn to of the proportion of the capital stock of the said corporation which is represented by its property located and business transacted in the State of Missouri, and has never paid into the Missouri State Treasury any incorporating taxes or fees, and said corporation has never complied with the laws of the State of Missouri with reference to foreign corporations doing business in the State of Missouri. And plaintiff says that by reason thereof said instrument is void and of no effect and should be cancelled and for naught held.

## "SECOND COUNT.

"Plaintiff for another and further defense to the new matter set up in the answer of defendants, Sonora Gold Mining and Milling Company, Rice McDonald, James M. Johnson and C. N. Robinson, says that the instrument set up and pleaded in the answer of said defendants is wholly without consideration and void and of no effect and should be cancelled and for naught held; that at the time of the execution of said instrument the said Sonora Gold Mining & Milling Company had no assets or property of any kind or description whatever, and the said fifty thousand shares of its capital stock mentioned in said instrument were entirely valueless, and the said Ernest Lindsay, deceased, received no consideration whatever for said instrument.

"And the plaintiff further says that at the time the said instrument of writing was signed and deliv-

244 Mo. Sup.—29

ered by the said Ernest Lindsay it was for the purchase of fifty thousand shares of the worthless capital stock of said corporation which placed said stock on the market at forty cents per share and held the same out to be of the value of forty cents per share, and same was taken by him on the solicitation of the said promoters, and on their false and fraudulent representation made by them to him that the said corporation owned valuable mining properties in the State of Sonora, Republic of Mexico; that said defendants then and there well knew said representation and statements to be false; and the said Ernest Lindsay would not have entered into said obligation nor purchased said stock had he not believed said statements and representations so made as aforesaid to be true and that said stock was of the value of twenty thousand dollars.

"That in truth and in fact the said Sonora Gold Mining & Milling Company had no assets of any consequence whatever, and the said fifty thousand shares of its capital stock were of no value whatever, and the said Sonora Gold Mining & Milling Company was not authorized to do business in the said State of Sonora, Republic of Mexico, and held no property therein, and had not complied with the laws of the Republic of Mexico so as to be authorized to make contracts or to hold or to purchase property therein. And the plaintiff says that the consideration for said obligation has failed, and the same should be cancelled and for naught held.

## "THIRD COUNT.

"Plaintiff for another and further defense to the answer of defendants states that the parties mentioned in the first count hereof as promoters, were promoters as therein stated, and that the said Sonora Gold Mining & Milling Company was organized as stated in the first count hereof; and for the purposes stated in the

first count hereof; and that Sonora Gold Mining & Milling Company never was authorized under the laws of the State of Sonora, Republic of Mexico, to do business in the said State, and never held or owned any property in said State. That the promoters never acquired the title to any property in the State of Sonora. That the said Ernest Lindsay signed the instrument hereinbefore set forth and that same was given for the purchase of fifty thousand shares of the capital stock of defendant corporation. That the said Ernest Lindsay at. the time he executed said obligation believed that the said company owned valuable mines in the State of Sonora, and was induced to so believe by the said company, by its officers and by said promoters who at said time and prior thereto falsely and fraudulently represented and stated to him that the stock represented by said fifty thousand shares was of great value, and was worth the sum of twenty thousand dollars and that the said company owned valuable mines in the said State of Sonora, and said Ernest Lindsay believed said statements to be true and acted thereon, when in truth and in fact neither said promoters nor said company had ever acquired the title to any property in the said State of Sonora and the said shares of stock were wholly worthless and of no value whatever. Plaintiff further says that the said Sonora Gold Mining & Milling Company has not procured the title to any property in the said State of Sonora, nor has any one for it, all of which was at 'all of the times herein mentioned well known to said defendants.

"Plaintiff further says that said obligation mentioned in the first count hereof is wholly without consideration and void, and was obtained upon the false and fraudulent representations made by the said promoters and the officers and agents of said State of Sonora. Plaintiff here tenders the return of the certificate of stock representing said fifty thousand shares of the capital stock of the Sonora Gold Mining & Mill-

ing Company, and plaintiff prays that the said obligation pleaded by defendants be cancelled and for naught held, and plaintiff renews his prayer for judgment on the notes mentioned and described in his petition."

In order to sustain the issues on the part of the plaintiff, the letters of administration upon the estate of Ernest Lindsay, were introduced in evidence; also the two notes mentioned in the petition, with certain indorsements on the backs of them, which are not here material.

Instead of resting his case here, if we correctly understand the record, the plaintiff took the laboring oar and undertook to prove the matters stated in the reply and thereby admitted the matters stated in the answer and counterclaim to be true.

The record in this case covers nearly four hundred and fifty pages of printed matter, and consequently it will be practically impossible for us to state even the substance of all the evidence introduced. We will, therefore, have to content ourselves by stating in the main what the evidence tended to prove, but where it comes to consider the vital issues in the case we will state the substance of some of the evidence bearing upon those questions.

From reading the pleadings it will be seen that the real issues in the case are presented by the reply, which are:

(a) Fraud and deception practiced by the defendants upon the stockholders and especially upon Ernest Lindsay, the deceased, which induced him to make and enter into the contract purchasing the fifty thousand shares of stock in the Sonora Gold Mining & Milling Company, stated in the answer.

(b) The want of, or the failure of consideration for, the execution of said contract by the deceased, purchasing said fifty thousand shares of stock in said company.

(c)  And the noncompliance of the Sonora Gold
Mining & Milling Company with the laws of this State,
and with the laws of the Republic of Mexico, which
plaintiff claims nullifies said contract.

Since the trial court peremptorily instructed the
jury to find against the plaintiff, and in favor of the
defendants in the counterclaim, it will be necessary, as
previously stated, to set out some of the evidence in-
troduced by plaintiff, tending to prove the issues just
before mentioned.

As regards the last issue, which is mentioned in
paragraph (c), there is no pretense made by defend-
ants that the company ever complied with the laws of
this State or with those of the Republic of Mexico.

The want of, or failure of consideration, pre-
viously mentioned in paragraph (b), depends largely
upon the defense of fraud and deception pleaded and
mentioned in paragraph (a), and for that reason
those two issues will be considered together.  And to
further simplify the statement of the case, we will
briefly state that in order to prove actionable fraud,
or such fraud as will vitiate a contract, the evidence
must show that the representations made regarding
the subject-matter of the contract were false in fact,
and that the party who made them knew they were
false, or that the party who uttered them had no rea-
sonable grounds for believing them to be true at the
time they were uttered; that the other party to the
contract or transaction  believed said utterances or
statements to be true and acted upon the same as true,
and that in consequence of said false statements and
said reliance thereon, said other party was injured
or damaged thereby.

We will now briefly note some of the evidence in-
troduced by plaintiff tending to prove those elements
of fraud.  But before doing so it may be well to state
that it is practically conceded by defendants that the
defendant Sonora Gold Mining and Milling Company,

at the times mentioned in the record, owned no mining property whatever; at most it only had a contract giving it a right to purchase certain mining claims; but be that as it may, the plaintiff introduced much persuasive evidence tending to prove the fact that the company had no mines whatever, which is sufficient for the purposes of this case.

Now as to the evidence of fraud practiced upon Mr. Lindsay, the deceased, and his reliance upon the same.

The plaintiff offered in evidence the depositions of a number of witnesses, which the record states were objected to specially and generally, but what the special objections were, the record fails to show. Said objections were by the court sustained, and the entire depositions were excluded from the jury.

We make this general statement in order not to restate the ruling of the court upon the separate offer of each deposition.

It was conceded that the officers of the company were Lewis W. Hax, president; C. H. Brown, first vice-president; Rice McDonald, treasurer; C. N. Robinson, secretary; J. A. Cronkite, general manager, and James M. Johnson, attorney.

The main office was in Denver, Colorado, with a branch office in St. Joseph, Missouri.

The deposition of Charles E. Cooper was offered in evidence by the plaintiff, and among other things he testified in substance as follows: That he resided in Lafayette, Indiana. That he took a trip to the State of Sonora, Republic of Mexico, in the early part of 1900, with a party of gentlemen, for the purpose of inspecting certain mining properties. Some of the officers of the defendant company were among the party. They showed him certain mining claims and stated they belonged to the defendant company. Their object was to induce him to purchase stock in the company. Among the party were N. W. Box, Frank Spen-

cer, William Murdock, Noah Justice, George Timberlake, L. B. Jackson, Henry Thieme, and Sol Goldsberg and W. F. Brand, of Danville, Illinois. That he did not remember all of the Missouri party, but there were Rice McDonald and C. N. Robinson of St. Joseph, Missouri. That C. A. Meeker and C. N. Robinson were the leaders of the party. That all the party went and viewed the mining property for the purpose before stated. That he had a long talk with Rice McDonald and that he told him that everything was all right, and that the title to the mines was clear.

The plaintiff offered the deposition of Noah Justice, who testified that he made the trip to the State of Sonora, Republic of Mexico, in February, 1900 or 1901; that Dr. Morrow of Kansas City, a man by the name of Johnson, another by the name of Miller and wife, also Rice McDonald, Charlie Robinson, a man by the name of Tootle, a lawyer by the name of J. M. Johnson, and Mr. Ernest Lindsay, were members of the party. That all of them went to look at the mining property which the promoters of the defendant company said belonged to it. That they viewed quite a number of them, but he did not see all of them. Some of the representatives of the company had a map showing what property belonged to it. All of them were in the neighborhood of some large gold mining claims, and they said they owned all of them, except there was a flaw in the title to one of them, or rather to a little corner of one of them. That outside of that the title to all their claims was perfect. Those statements were made by C. N. Robinson, Rice McDonald, C. A. Meeker, and Lewis Hax of St. Joseph. That on the way back from Sonora, usually Mr. Meeker, Mr. McDonald, Mr. Johnson or Mr. Hax, took the guests on the train back to the stateroom to talk over the proposition. Mr. Ernest Lindsay was with them on the trip. That he did not remember any one of the guests who visited the mines who was not taken back into the stateroom

by some one of those gentlemen, usually by Mr. Robinson. That all of them stated to him that they owned the mines which were shown to him, before he purchased stock in the company. The purpose of taking them to the mines was to sell them stock and thereby raise money with which to develop the mines and construct a mill with which to handle the ore.

The deposition of Dr. Calvin J. Morrow, of Kansas City, was offered by plaintiff. He testified that he went on a trip of ten days to Mexico with Charles N. Robinson, Rice McDonald, James M. Johnson, Charles A. Meeker and Ernest Lindsay of St. Joseph. The trip was made in February, 1900. That they had a Pullman for the party. We went to Nogales, stopped at Torres, and then went on a branch road to Minas Prietas, then to Guaymas, then back to Hermosillo. That he remembered Mr. Lindsay and Mr. Tootle were among the party. That Mr. Brown did the principal talking to him. That Brown told him that they purchased these mines and that they wanted to sell stock for the purpose of developing them. The promoters came from St. Joseph. Johnson, a lawyer, Lewis Hax, young Hardwick, Rice McDonald and C. N. Robinson were among the party. That one of the mines shown them was the Bastillo, which had a shaft 460 feet deep in it. That he went down in the shaft. That he did not buy any stock, but Mr. Brown gave him $1000 worth of it. That Brown wanted him to go on the trip to influence others, among whom was his brother-in-law, C. A. Murdock, George Greene and Fred P. Smith, all personal friends of his. That he did not think that he ought to go, but Brown said, "If you will go, I will not only pay your transportation, but will give you $1000 worth of stock for yourself." That he accepted the offer and went down, and received the stock some six weeks later. That his wife went with him. Transportation and sleepers were furnished them, but they paid for their meals. That they had an engine

there for hoisting purposes, and they went down in the Bastillo mine, and looked it and the other mines over, which they said belonged to the company. The entire party went together. The conversation regarding the properties was general among all the parties that went down. Some of the officers said they paid $100,000 for the mines; all of them claimed that they were very valuable.

The deposition of Isaac Clements, of Illinois, was offered by plaintiff. He testified: That he made the trip to Mexico in February, 1900, with Mr. Ernest Lindsay, a lawyer by the name of Johnson, Mr. McDonald, Mr. Tootle and Mr. Robinson, from St. Joseph, and Mr. Brown and wife, Dr. Morrow and wife and an old man who owned the Inter-Ocean Hotel, from Kansas City; also Mr. Heinly, Mr. Palmer, Sol Goldsburg, Mr. Brand and Mr. Meeker. That the purpose of the trip was to inspect certain mining property, with a view of investing in them. Free sleepers were furnished the party from Kansas City and return, with lunches. Everything was free to me, and I understood the same was to all others who had been invited to go. That the promoters were along in the car with the invited guests. That they inspected two mines in operation, which belonged to an English syndicate, which were very valuable. The promoters did not claim any interest in those mines, but they wanted us to see what could be done in mining in that vicinity. That they were then shown the properties which they claimed belonged to the defendant company. The promoters undertook to sell us stock in the company on our return trip. They stated generally to the guests that they owned the group of mines in the vicinity of the two English mines, which were being operated. That on the return trip they took the different guests into the stateroom for the purpose of selling them stock. The purpose was to take them there and sell stock in the defendant company. That

his impression was that Mr. Lindsay was the first person they took into the stateroom for the purpose of selling him stock. That there was general talk by the promoters to the effect that they had good title to the mines shown to the prospective purchasers, and were selling the stock with a view of working them. They also told them how they were going to operate them, and what could be made out of them.

Plaintiff offered the deposition of John H. Palmer, who testified: That he went with the party to Mexico in February, 1900. The purpose of the trip was to show them certain mines with a view of selling the guests stock in the company. That the mines were visited and inspected, and they stated that the mines shown were their own property. They so stated that to the witness and to others with the idea of getting them to purchase stock in the company. They wanted the money for the purpose of developing the mines. That the entire party made the round trip in a first-class Pullman car, and they had a full supply of edibles and everything to make the trip delightful. There was a general talk to all, that the company owned the mines and that they were very valuable. They were trying to sell stock upon the return trip, and they would take each guest into the drawing-room of the sleeper by themselves. That each and all were quite sure that all the gentlemen of the party were taken into the stateroom, for the purpose of selling them stock. All the guests had the same idea of the trip and its purpose. Mr. Robinson, Mr. Johnson, Mr. McDonald, one or the other of them, were in there all the time, so were Meeker and Brown. That Johnson and Robinson were the principal spokesmen for the promoters, regarding the mines. They said they owned nine or ten mines.

Plaintiff offered the deposition of William F. Brand, who testified: That he was in Sonora, Mexico, in February, 1900, when the party from St. Joseph,

Kansas City and Illinois reached there. Ernest Lindsay, Governor Clemments, J. H. Palmer, C. N. Robinson, Rice McDonald, C. A. Meeker, and C. H. Brown were among the party. They came to Minas Prietas. They examined the different mines. Mr. Robinson and several other gentlemen had the party in hand and were showing them the different mines. That he was acquainted with the group of nine or ten mines they were inspecting. The Union Minera people owned them and sold them to the defendant company for $120,000, which paid $20,000 to bind the sale. That Robinson, Johnson and others took the guests separately into the drawing-room of the car, to talk the matter over. There were perhaps twelve persons in the party outside of the promoters. Mr. Lindsay was one of them. That his expenses of the trip were paid by the defendant company.

Plaintiff offered the deposition of Charles A. Murdock, who testified: That he had been to Sonora, Mexico, three times. Mr. Lindsay went with him on the first trip. There were about twenty-five in the party, and they went in a special Pullman. Dr. Morrow, Mr. Smith, George Greene and Mr. Brown of Kansas City, Mr. Tootle, C. N. Robinson, Rice McDonald and James M. Johnson from St. Joseph, and Mr. Meeker from Lafayette, Indiana, were among the party. That Meeker, Robinson, McDonald and Johnson seemed to be active in the promotion of this mining scheme. They showed the mines to the guests and said that they owned them.

Plaintiff offered the deposition of Robert G. Webber, who testified: That he was secretary and treasurer of the Webber Gas & Gasoline Engine Company, at Kansas City. That he went to Mexico with Mr. Lindsay and others in February, 1900, to look at the mines said to have been owned by the defendant company. There were about twenty-five went down in a special car. Among them were Mr. McDonald, Mr.

Hax, Mr. Hosea, C. N. Robinson, Mr. Brown, Dr. Morrow, F. P. Smith, Mr. Murdock, Mr. Meeker and Mr. James Johnson, and others whom he did not remember. That the object of the trip was for the promoters to exploit their mining properties and sell stock. They showed them the various mines they claimed to own. That he did not remember the names of the mines. There was a group of them together, they claimed to own. The entire party that went down were present and looked at the mines that were pointed out. Upon the return trip the promoters made offers to sell stock. They had the drawing-room and they took the various men in there separately to sell them stock. They said the company owned the mines shown to the party.

Plaintiff offered the deposition of F. P. Smith, who testified: That he went to Sonora, Mexico, in February, 1900, with the party that went down to look at certain mines. Charles Murdock, Dr. Morrow, George Jones, Lewis Hax, Milton Tootle, Ernest Lindsay, Ernest Hartwig, Mr. Hosea, C. N. Robinson, C. H. Brown, C. A. Meeker and James M. Johnson went down at the same time. There were about twenty-five in the party. All went in a special sleeper at the invitation of the parties who owned the mines. They wanted us to look at their mining properties and purchase stock in their company. They pointed out certain mines and said they owned them. That he saw Ernest Lindsay there. He was looking at those properties. That they were all there together.

Upon a general objection made by counsel for the defendant, the court excluded all of the depositions before mentioned, and counsel for the plaintiff duly excepted.

John Donovan was called as a witness by plaintiff. He testified that he had a conversation with Mr. Lindsay, Mr. McDonald, Mr. Robinson and Mr. Johnson in the city of St. Joseph, shortly after they returned from Mexico, where they and others had been to in-

spect certain mines, said to belong to the Sonora Gold
Mining & Milling Company. That they said they had
certain mining property in Sonora, near the west coast
of Mexico. They had maps showing their location,
and wanted to sell stock for developing purposes.
This talk was made by those 'gentlemen to him and
Mr. Lindsay. They wanted to interest him in the
property and said they would do so if he would raise
some money to develop the property. That as a re-
sult of the conversation he went to Chicago and pre-
sented the matter to Mr. Swift and to some persons
connected with the Hammond Packing Company. Then
the following occurred:

"Q. Now, in their representation to you to bring
these parties in, was it on the basis of the ownership
of these mines?

"Mr. STROP: I object to the question.

"THE COURT: The objection is sustained.

"MR. BOYD: Sustained on the ground that it is
leading, Your Honor?

"THE COURT: No, sir; on the ground that it is
irrelevant and immaterial.

"MR. RANDOLPH: We offer to prove by Colonel
Donovan that he, at their solicitation, saw parties con-
nected with the Swift Packing Company and with the
Hammond Packing Company on the basis that Mr.
McDonald, Mr. Robinson and Mr. Johnson stated that
the Sonora Gold Mining & Milling Company owned
these properties, that they wanted the money for de-
velopment purposes, and that this occurred in the
months of March and April, 1900.

"THE COURT: The objection is sustained.

"MR. RANDOLPH: We except.

"MR. RANDOLPH: Q. Did Mr. Lindsay, and your-
self, and any of these men you have named as con-
nected with the Sonora Gold Mining & Milling Com-
pany as promoters, make the trip to Chicago. A. Yes,
sir.

"Q. Whom did you see in Chicago? A. If I remember right, it was Mr. McDonald and Mr. Lindsay, I don't know whether any others were there or not. My best recollection is that it was in March; and we met Mr. Lyman, president of the Hammond Packing Company, and if I remember right, his father-in-law, Mr. Edward Chapman. There were represented there the same things that were said to me here, that they were the owners of the claims, and needed money for development; and an arrangement was made whereby they were to take an expert engineer and some of themselves; and the expenses of the trip to be paid by the Sonora Company, provided that they did not see fit to make the investment. I never, in any meeting with Mr. McDonald, Mr. Robinson, Mr. Johnson, or Mr. Hax, heard any other state of facts disclosed, than that the Sonora Company owned these mines; that was my understanding, and that was the basis of it all.

"The first meeting with those gentlemen and Mr. Lindsay was before the trip to Chicago. In these conversations, these gentlemen spoke of the value of the mine. They had very extravagant ideas of its value. I cannot tell you, into the millions, what it was to be, but it was supposed to be very valuable property.

"MR. RANDOLPH: I want to ask this question, and you need not answer it until the gentlemen have an opportunity to object to it: At the time Mr. Lindsay asked you to come and meet these gentlemen at that first meeting prior to the first meeting with these gentlemen, did Mr. Lindsay state to you why they wanted you to come; and state to you what he had learned from them, as to the ownership of those mines; and what he had seen in Old Mexico; and in pursuance to that request, did you and Mr. Lindsay go to the meeting?

"Mr. Strop: We object to the question, and especially to what Mr. Lindsay stated to him that he had learned.

"The Court: No, I think that is not competent.

"Plaintiff then and there excepted to the ruling of the court.

"Q. How long before you went to Mr. Robinson's office on that first visit, was it that Mr. Lindsay asked you to go, and had the conversation that I have tried to bring out in the former question? A. We had some conversation before he ever went south. That conversation occurred, I think, the day before, if not the same day, on which we went to the office."

The plaintiff then offered to show, as part of the *res gestae,* that Mr. Lindsay made the statement, coupled with the request to go to the office with those gentlemen, concerning their representations of ownership. The court sustained the objection to the question and the plaintiff excepted.

Plaintiff then made the following offer: "We offer to prove by this witness that just prior to the first visit of the witness with Mr. Ernest Lindsay, now deceased, to the office of C. N. Robinson, one of the defendants herein, Mr. Lindsay stated to him that the Sonora Gold Mining & Milling Company owned certain mines in Sonora, Mexico; that he had been assured that they did own them by the promoters, Mr. J. M. Johnson, Mr. Rice McDonald, and Mr. C. N. Robinson; and that they had asked him to have the witness come to their office, that they might make arrangements with him to interest certain Eastern capitalists, with whom he was well acquainted, for the purpose of raising money to develop the mines.

"The Court: The offer is rejected. Plaintiff excepts.

"Q. Now, I will ask you if, immediately before Mr. Lindsay went to Mexico, if he stated to you anything that he claimed had been stated to him with ref-

erence to the title to these mines in Sonora, Mexico, by Mr. Johnson, Mr. McDonald, Mr. Robinson, Mr. Hax, or either of them? I mean Mr. Lindsay who is now deceased. "Defendant objected to the question as being self-serving. The objection was sustained, and plaintiff excepted.

"MR. RANDOLPH: Now, in view of the statement Mr. Rusk made to the jury that the people were not let in because they were too greedy, I want to show by this witness that the expert employed by the Hammond Packing Company, who went there, ascertained that they had no title to the mines, and that that was the reason they turned it down.

"THE COURT: The offer will be rejected.

"Plaintiff excepts.

"MR. BOYD: Now, is there any dispute as to what statement Mr. Rusk made to the jury?

"THE COURT: I think I remember his statement.

"MR. BOYD: So that we have a right to refute even the statement of a lawyer?

"THE COURT: Proceed with your case.

"CROSS-EXAMINATION.

"Q. Colonel Donovan, the cause of your going to the meeting at which you and Mr. Robinson and these other gentlemen were was because Mr. Lindsay came to you about the matter? A. Yes, sir.

"Q. You were on terms of intimacy and close business relationship with the Swift interests at Chicago, and also with the Hammond interests? A. Yes, sir; I think undertook alone to interest the Swift interests, and after they turned it down, the gentlemen came to Chicago, where I was, and took it up with the Hammond people. I introduced them. I was to have a certain amount of stock in the company, as my compensation, I forget the amount. There was no understanding between Mr. Lindsay and myself that we

were to divide. I never heard of any arrangement that Mr. Lindsay was to get any additional amount of stock if the Chicago people took hold of the matter, and I never heard Mr. Lindsay say that there was.

"RE-DIRECT EXAMINATION.

"Q. Mr. Donovan, one of the attorneys for the defendants asked you, if Mr. Lindsay came to you and arranged with or spoke to you about going to the interview which these gentlemen, whom you have already mentioned, who you have already stated said they owned the mines; now, in furtherance of the question asked by the counsel on the other side, in order to finish the matter concerning which he has asked you, I desire to ask you what Mr. Lindsay said to you in getting you to go to that interview.

"MR. STROP: I object to the question. I have asked the witness nothing which should elicit any statement from Mr. Lindsay. What I asked, they proved that themselves, and I simply emphasized it.

"MR. BOYD: I ask you, and I have a right to know, what suggestions Mr. Lindsay made, and I ask you, on that occasion, what did Mr. Lindsay make?

"MR. STROP: We object to it.

"THE COURT: The objection is sustained.

"MR. BOYD: We except."

Mr. John D. Richardson, having been sworn as a witness, on behalf of the plaintiff, testified as follows: My name is John D. Richardson, I am in the wholesale dry goods business. The name of the corporation is the Richardson Dry Goods Company, located on the corner of Third and Jule streets, St. Joseph, Mo. I knew Mr. Lindsay in his lifetime from the time I came here more than thirty years ago up to the time of his death. He was with the State Savings Bank, afterwards the First National; after that

bank went out of business, I could not say what his business was. He was looking after his own affairs, I think. I have known Mr. Rice McDonald ten or fifteen years, possibly twenty. I have known James M. Johnson, I presume, twenty-five years; and I have known Charles N. Robinson about the same length of time. I purchased some stock from the Sonora Gold Mining & Milling Company. The transaction was with C. N. Robinson; I invested twenty-five hundred dollars; that must have been about 1899, probably in the summer of '99. I actually put in twenty-five hundred dollars in cash. At the time I was making this investment, Mr. Robinson showed me a blue print, claiming that these mines were in Sonora, near the Pacific Coast, in Old Mexico. He said, with reference to them, that they were owned by the Sonora Gold Mining & Milling Company, and the talk was that they were selling stock in order to develop the mines. That was the reason I bought the stock. I had known Mr. Robinson for a number of years, and he said it was a good thing, and I took some of it, and I have still got it.

"Q. Have you had any returns or profits from it at any time? A. Not up to date.

"Q. Has the stock any market value now? A. Not that I know of."

Milton Tootle, Jr., having been sworn as a witness on the part of the plaintiff, testified as follows: I have lived in St. Joseph all of my life. I am connected with some enterprises, and with the bank on Sixth and Francis. I am president of the Tootle-Lemon National Bank. I give my business and the banking business my personal attention. I am acquainted with C. N. Robinson, Rice McDonald, Louis Hax and James Johnson, and was acquainted with Mr. Ernest Lindsay, now deceased. I knew them for a great many years. Mr. Ernest Lindsay engaged principally in the banking business at Fourth and Felix streets. I took some stock in the Sonora Gold Mining

& Milling Company; I think it was in 1900, possibly 1899. It was before I went to Mexico to view that property.

"Q. Speaking as to the purchasing of the stock which you bought before you went on that trip, I wish you would state what representations were made to you, if any, concerning the ownership of the mines which the promoters of the Sonora Company claimed to own?

"Defendants objected to the question, as not tending to prove or disprove any issue in the case. Objection was sustained, and plaintiff excepted at the time.

"A. I purchased my stock of Mr. Rice McDonald, Mr. Robinson and Mr. Johnson. They were the parties who talked with me first regarding the purchase of this stock.

"Q. State what they said to you in connection with the sale of the stock, as to the ownership of any mine.

"Defendants objected to the question. The objection was sustained, and plaintiff excepted at the time.

"A. In the early part of 1900, Mr. Robinson, Mr. McDonald and Mr. Johnson organized an excursion to go down to Mexico, in order to have people go along with them. I was asked to make that trip, as their guest; Mr. Lindsay was one of the party also. I think it was in February, 1900; it was in the winter, but I am not sure about the month. Mr. C. N. Robinson influenced my going. I have known him about twenty years, knew him very well, he had been in the employ of Tootle, Hosea & Company for a number of years. After I became of age, I had some business dealing with Mr. Robinson. I know him very well, had intimate business relations with him. We were gone about ten days. We had a special car, a private car. There were a number of people on the car; as I remember it, it was full. Among the St.

Joseph people were Mr. Davison, Mr. Lindsay, Mr. Robinson, Mr. Hax and Mr. McDonald. Outside of the promoters, all I can recall of the St. Joseph people are Mr. Davison, Mr. Lindsay and myself. We were invited guests.

"Q. Now, I will ask you to state, if during that trip, there—I wish you would state to the court what was the attitude and what was said by Mr. Robinson and Mr. McDonald concerning the object of the trip and the ownership of the property which they called mines. Now, you can make a statement to the court, without my suggesting anything definite along that line—Mr. McDonald and Mr. Robinson, what was their attitude, as to the ownership of the properties that they claimed to be mines?

"Mr. Rusk: We object to that, without they show to whom these representations were made.

"Mr. Boyd: Well, before the people generally, that were guests.

"Mr. Rusk: Well, now, that is too indefinite. We have been thrashing this over a good deal, and if there were any representations made to Mr. Lindsay, or in his presence, they can certainly show that.

"Mr. Boyd: Mr. Lindsay was one of the guests that went along on that excursion? A. Yes, sir. We had only one car for the use of that trip.

"Mr. Boyd: Now, I repeat the original question asked, Your Honor.

"Mr. Rusk: We renew the objection.

"The Court: The objection will be sustained, unless you show that Mr. Lindsay was present, at the time that statements were made. Now, you ask Mr. Tootle if Mr. Lindsay was present at the time any statements were made?

"Mr. Boyd: Q. You may state what Mr. Robinson, Mr. McDonald and Mr. Johnson and those people said they were taking the guests down there for."

·Defendants again objected. Objection was sustained, and plaintiff excepted to the several rulings of the court.

"Mr. Boyd: The question is as to what was publicly stated to the court.

"The Court: No, you have shown that Mr. Lindsay was on the trip, but you have not shown that Mr. Lindsay was there at the time these statements were made. The objection is sustained." Plaintiff excepted.

"The Witness: The car was a private car, and was just for the use of the people that went from here. Mr. Lindsay was one of the guests on the car. Mr. Lindsay went away from here on the car with these gentlemen, and returned with them. He made the entire trip; at least, he made the entire trip down and back, as far as Kansas City.

"Mr. Boyd: The plaintiff desires to ask the witness whether the statements, made by these gentlemen going down there, and in their various talks on the train, while Mr. Lindsay was there on the car, if they stated that they owned the Bastilla and other properties down there." Defendant objected; objection is sustained. Plaintiff excepts.

"The Court: You may ask Mr. Tootle if he saw Mr. Lindsay present at any time these statements were made.

"Mr. Boyd: You saw him on the car, did you not, Mr. Tootle? A. Oh, yes. The distance down there is more than a thousand miles. I knew Mr. Lindsay very well.

"Q. Could he hear? A. As far as I know, he could.

"Q. You may state whether he was present, on the car, when these gentlemen were talking about the properties, and within hearing of some of them who were stating about the ownership of these properties. State what you know about that subject. A. Well, he was undoubtedly there, and in as much as the talk

most of the time on the trip was centered on the properties and their value, I would say that undoubtedly he had heard it, but as to making any definite statement, that I would swear to the fact that he did hear it, I would not do that.

"'Q. I will ask you if he was in such a position on the car and was so located, that if he had ordinary hearing and intelligence, he could hear what was said? A. Yes, sir.

"Q. Now, you may state, if after you arrived near the vicinity of these claims—if any person conducted you and Mr. Lindsay and the other guests to the place where the mines were said to be; and who were the conductors and leaders of the guests on that excursion? Who led the crowd of people, including Mr. Lindsay and yourself? A. Well, after we had arrived at this town of Torres, I think it was the superintendent, whose name I do not recall, seemed to take the lead, and pointed out the claims and the different mines. His name was Cronkite.

"Q. And in the presence of the people who had gone on the train, including yourself and Mr. Lindsay? A. Yes, sir."

Defendant objected because it was not shown that Mr. Cronkite had any authority to make representations about the title or the property.

The court here made the remark that Mr. Cronkite was now mentioned for the first time; that he was not a defendant.

"Mr. Boyd: Except that he was the manager for these gentlemen."

It was also stated that if Mr. Robinson, Mr. McDonald, Mr. Johnson, or any one of them were present, and he made a statement about the ownership, and if they did not refute it, they would be bound by it.

The Court then remarked: "Still that has not been shown yet."

"Mr. Randolph: Why, yes it has, Your Honor. Mr. Boyd has asked him who led the crowd, and mentions all of them.

"The Court: Objection is sustained." Plaintiff excepted.

"Mr. Boyd: Q. Mr. Tootle, I will ask you if, when Mr. Cronkite, the superintendent, made these statements, Mr. Robinson, Mr. Rice McDonald, Mr. Johnson or any of them were present in the group of people to whom these statements were made, and when the mines were shown? A. They were present when the mines were shown, that is, when Mr .Cronkite showed the mines.

"Q. Then you may state what was said about the mines, as to whether they are our mines, or your mines, or whose mines. I wish you would make a statement of what was said by Mr. Cronkite and₄these gentlemen concerning the property or its ownership, rather—not the value of it yet. A. The first morning that we arrived at the mines, we were taken to view the Bastilla mine, and they had opened quite a number of feet of shaft, I think, and some little drifts from the shaft, and I was requested—the whole party were surrounding the mouth of this shaft—and I was requested to descend into the shaft, which I did. We remained there some little time, and during the course of the conversation regarding the property, it developed that there was some controversy over the claim, that is, that there was a surrounding claim, or neighboring claim to be crossed, this had lapped it, and it developed that there was some litigation regarding the lapping of that claim. That was discussed at length, and I gained the impression, at that time, that even if this litigation with reference to that Bastilla property was not successful to the Sonora Company that it made practically little difference to them, as the amount expended on it had not been great, and that they had

other claims there that some of the parties interested felt were of greater value than the Bastilla property. I had secured information before we arrived at the Bastilla that that property was not owned in fee title by the Sonora Company. Mr. Robinson, prior to that time, had told me that the property was owned in fee simple by the Sonora Company. The group were all together looking at these mines.

"Upon our return to Torres, we took the same Pullman to come home, the same private car. Mr. Johnson, Mr. Robinson, Mr. McDonald and Mr. Hax had headquaters in the drawing-room apartment of the car. They used it for their business transactions. They took the guests in there. It might have been that at times they would take them in groups and also singly. I could not state positively that they did take them in groups. I know that I was interviewed in that room privately by Mr. Robinson, Mr. Johnson and Mr. Cronkite, just by the promoters. I had, previous to this trip, bought some stock on Mr. Robinson's representations.

"Q. How much did you pay for that?" Defendant again objected. Objection was sustained. Plaintiff at the time excepted.

"The stateroom apartment was at one end of the car. It was closed so that it was private. That is, it became so by closing the door. Mr. Robinson, Mr. Johnson, Mr. Hax, Mr. Cronkite and Mr. McDonald used that as their office to dispose of business on the way back.

"Q. Did you notice whether or not Mr. Lindsay went in there with them at any time? A. I judge he did, although I cannot say that. I think they had everybody interviewed.

"Q. And those interviews, so far as you learned from the interview with you, were for what purpose?" Defendant objected; objection sustained. Plaintiff excepted.

"Q. I will ask you whether or not they stated that the Sonora Gold Mining & Milling Company held the title to this mine, called the Bastilla?" Defendants objected; objection was sustained, and plaintiff excepted.

"Q. Mr. Tootle, after you had ascertained that the statement, that they had title to this Bastilla, was not true, did they offer to return your stock to you?" Defendants objected; objection was sustained, and plaintiff excepted.

"MR. RANDOLPH: We offer to show that they offered to return the stock, that then a new bargain was made, based upon a contingency with reference to the title." Defendants objected; objection sustained; plaintiff excepted at the time.

The plaintiff offered to show that that talk occurred on the car on the way home from the trip. The offer was rejected and plaintiff excepted.

There was much more evidence introduced of the character before stated, but this statement will not be prolonged by stating it, or its substance, because that which is stated sufficiently presents the theory upon which the court tried the case and the facts upon which the questions of law presented are predicated.

There was also evidence introduced which tended to show that the defendant company never perfected the alleged purchase of the mines in question, but forfeited the $20,000 alleged to have been paid to bind the bargain of the $120,000 purchase price, and subsequently brought suit in the courts of Mexico to recover the $20,000 so paid, but it was unsuccessful in that litigation.

Plaintiff also offered in evidence certain printed matter in the nature of a prospectus, purporting to have been issued and circulated among the prospective stock purchasers. This evidence was excluded, and the plaintiff duly excepted.

The plaintiff, thereupon, rested his case, and at the request of counsel for the defendants the court gave an instruction in the nature of a demurrer to the evidence, telling the jury that under the pleadings and evidence the plaintiff was not entitled to a recovery, and that their verdict should be for the defendants on the counterclaim.

In response to said instruction, the jury returned a verdict against the plaintiff and in favor of the defendants, for the counterclaim, for the sum of $8889.05.

In due time, and in proper form and manner, the plaintiff appealed the cause to this court.

## OPINION.

As previously stated, this is a suit based upon two promissory notes. The defense pleaded was payment. The reply charged fraud regarding said payment, and a want of, or a failure of, consideration for the contract of payment.

Under this state of the pleadings, the execution of the notes sued on was thereby admitted, payment of the same as alleged in the answer was confessed, but the validity of the payment is questioned. Under that state of the pleadings, the plaintiff assumed the laboring oar, and undertook to prove fraud in the procurement of, and failure of consideration for, the contract, satisfying and cancelling the notes sued on.

The appellant introduced an abundance of evidence, which tended to show that the respondents and none of them owned any property whatever belonging to the enterprise in question, at all the times mentioned in this case.

Taking the most favorable view of the evidence that is possible for the respondents, it tends to show that they had only a contract of some character giving them the right to purchase the mines mentioned in the pleading and evidence, upon the payment of the purchase price of $120,000.

It is almost conclusive from the evidence introduced that only $20,000 of that sum was ever paid, and in consequence thereof the contract of purchase was practically conceded by respondents, by instituting suit in the courts of Mexico, to recover the $20,000 so paid, without asking for a specific performance of the contract of purchase.

The respondents having no title to the mines mentioned, at the time they were endeavoring to sell and did sell stock to the public in general, and to Mr. Lindsay in particular, the importance of the testimony of the witnesses whose depositions were offered in evidence, as well as that of those who testified orally at the trial, becomes apparent. It not only tended to prove, but it shows beyond a reasonable doubt, under the demurrer, that the promoters of the proposition, and the defendant company, through its regularly constituted officers, represented to the prospective purchasers of stock that the company owned the mines which they were taken to Mexico to see, and that they wanted the proceeds of the stock sales, not to pay for the mines themselves, but to develop the valuable mines which they said the company then owned, and for the further purpose of erecting mills thereon with which to handle and treat the ores thereof.

If we correctly understand the position of counsel for the appellants, and the theory of the trial court, they do not controvert the fact that said testimony shows the objects, purposes, and conduct of the respondents were as just stated, but their insistence is that the record fails to show that any of said representations, as to the ownership of the mines, or that the objects and purposes of the respondents in selling the stock, were ever communicated to Mr. Lindsay, the deceased, or that he acted upon, or purchased the fifty thousand shares of stock mentioned in the contract set out in the pleadings and evidence, for those reasons.

This insistence is wholly untenable. While it is true the record contains no direct and positive evidence which shows said representations were made to Mr. Lindsay, or that the object and purposes of the respondents were made known to him, yet the record abounds with facts and circumstances from which the court and jury may very well have inferred that those matters were communicated to and were known to him.

The uncontradicted statements of all of those witnesses were to the effect that the excursion to Mexico was gotten up for the purpose of taking the party of prospective investors down there to look at the mines of the defendant company, with a view of selling them stock, for the purpose of developing the same, and erecting mills thereon, with which to handle and treat the ores. Mr. Lindsay was one of the party, and was taken down there for that purpose just as all the rest of them were, or at least, there is no evidence tending to show that he went for any other purpose. He accompanied the parties who went for that purpose, and was frequently seen mingling with and talking to the parties to whom said business proposition was presented, and to whom said representations were made, and who knew of the object and purposes of the trip. Those representations were generally and freely made by the respondents to all of their guests upon the car, in going down, while in Mexico, and while on the car in returning home. Why should those representations be made to, and heard by all the other guests, and not by Mr. Lindsay? The record shows that he was a man of good sense, fine business qualifications, and had had vast experience in business transactions. Is it not reasonable to infer that he understood what they did?

Not only that, the evidence offered tended to show that Mr. Lindsay was the first person invited into and to enter the stateroom of the sleeper upon the return trip, where each and all of the guests were taken sep-

arately, for the purpose of selling them stock in the defendant company. Why was he invited and taken into the stateroom, just as all the rest of them were, if it was not for the purpose for which they were all taken in there, namely, to sell him stock in the company and for the purpose of raising money with which to develop the mines and erect the mills thereon?

Moreover, Colonel Donovan testified that he and Mr. Lindsay, by previous arrangement, met some of the respondents in the city of St. Joseph, for the purpose of consulting about raising money with which to develop the mines of the company. They there represented to him and Lindsay that the company owned the mines, and offered to interest him in the company if he would raise them some money for that purpose. Counsel for appellant offered to prove by this witness, that the respondents authorized him, in the presence of Lindsay, to state to Swift and others of Chicago that the company owned the mines, and authorized him to sell them stock in the company upon that basis. That evidence was also excluded, and exceptions were saved.

Appellant introduced Milton Tootle, Jr., and John D. Richardson, as witnesses, and offered to prove by them that the respondents stated to them that the company owned the mines mentioned, with the view of selling them stock, and that in pursuance of said representation each of them did purchase stock in the company. That evidence was objected to by counsel for respondents, and excluded by the court, to which action of the court appellant duly excepted.

There can be no question but what all of this evidence tended to prove that said representations were made to Lindsay, the deceased, and that they were false when made.

Counsel for respondents argue that, even though it should be conceded that said representations were made to Mr. Lindsay and that they were false, yet

the ruling of the court in excluding said depositions and testimony of the witnesses who were introduced at the trial, was proper for the reason that the evidence fails to show that Mr. Lindsay relied upon them and purchased the fifty thousand shares of stock mentioned in the contract of purchase set out in the answer. This contention is also unsound, for the reason that he did purchase said stock in the manner and form stated in the answer, and there was no other evidence tending to show that he purchased it under any other or different circumstances, than those detailed in evidence. That being true, the conclusion is irresistible that he purchased the stock because he believed the company owned the mines shown him, and that he was willing to purchase the fifty thousand shares for the $20,000, and thereby enable the company to develop its mines and put in machinery. It is not reasonable to believe that he would have invested said $20,000, in the stock of the company, if he had not believed that it owned said mines.

There is no pretense made that the company owned any other property, money or assets of any kind whatever, except said mines; and to hold that so good a business man as the evidence shows Mr. Lindsay to have been, would invest $20,000 in the stock of a company which had no capital or assets of any kind, would be contrary to common sense and all reason.

The excluded evidence, if admitted, would clearly have made out a prima facie case for the appellant, and would have called for proof on the part of the respondents.

What the real facts of the case are, we know not, and are not liable to know until the respondents put in their evidence. They may have a perfect defense, but we can not anticipate or know what it is until we hear their evidence. We simply hold that the appellant would have made out a prima facie case had the court not erred in excluding testimony.

We are, therefore, of the opinion, that the trial court erred in excluding said depositions and the testimony of the witnesses that were offered at the trial.

There are other questions presented and argued, but the facts upon which they are predicated are so imperfectly presented by the record that we will not at this time pass upon them. A clear presentation of them to the court at the next trial will in all probability enable the trial court to properly pass upon them.

For the reasons stated, the judgment of the circuit court is reversed and the cause remanded for a new trial. All concur.